UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
LAWRENCE GOETZ and R & L LEASING, LLC,

                          Plaintiffs,                    06-CV-8180 (RPP)

              - against -

                                                         **OPINION & ORDER**

PETER HERSHMAN and SIEGEL O'CONNER
ZANGARI O'DONNELL & BECK P.C.

                          Defendants.
-----------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

       After a six day trial, a jury returned a verdict in favor of Plaintiff Lawrence Goetz,

finding Defendant Peter Hershman, and his former law firm Siegel O'Connor Zangari

O'Donnell & Beck, P.C. ("Siegel O'Connor"), liable for malpractice and breach of

fiduciary duty and awarding Plaintiff $810,000 in damages.  By motions dated February

26, 2010, Defendants Peter Hershman and Siegel O'Connor move for judgment as a

matter of law pursuant to Federal Rule of Civil Procedure 50(b) and, in the alternative,

move for a new trial pursuant to Federal Rule of Civil Procedure 59.  On March 12 and

March 17, 2010, Plaintiff submitted memoranda of law in opposition to Defendants' Rule

59 and Rule 50 motions.  On March 23 and March 30, 2010, Defendants submitted reply

memoranda of law in further support of their Rule 59 and Rule 50 motions.

       By post trial memorandum dated January 29, 2010, Plaintiff moved for an award

of prejudgment interest.  Defendants opposed Plaintiff's prejudgment interest motion by

memorandum of law dated February 8, 2010, and Plaintiff filed a reply in further support

of his pre-judgment interest motion on February 11, 2010.  This opinion resolves each of the three post-trial motions in this matter.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

In this case, Plaintiff's[1] claims are based on Defendant Peter Hershman's actions as an attorney during the time leading up to the dissolution of a 24 year business relationship between Plaintiff Lawrence Goetz and Richard Volpe, a non-party to this action.  The facts of the case were presented through documentary evidence and the testimony of Lawrence Goetz and Peter Hershman.  Mr. Hershman testified about his representation of Mr. Goetz, Mr. Volpe and their businesses over the years.  Plaintiff also called two expert witnesses who testified about the duty of professional care and duty of loyalty that lawyers owe their clients under Connecticut law and who provided expert opinion testimony, based on a set of assumed facts, on whether Mr. Hershman's conduct fell below the required level of professional care and duty of loyalty.  Defendants Peter Hershman and his former firm, Siegel O'Connor, also called two expert witnesses to opine on whether Mr. Hershman's conduct fell below the professional standard of care and duty of loyalty owed to his clients.  Viewing the evidence in the light most favorable to the non-moving party (in this case Plaintiff) and drawing all reasonable inferences in favor of the non-moving party, as the Court must on a Rule 50(b) motion for judgment as a matter of law, Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008) (per curiam), the following facts were established at trial.

---

[1]      R&L Leasing, LLC is a nominal plaintiff in this action as there is no claim asserted by R&L Leasing that is not asserted by Goetz.  For purposes of simplicity, references to "Plaintiff" in this opinion refer to Goetz individually.

**Formation of R&L Leasing**

Together with Mr. Volpe, Mr. Goetz owned a company called Able Automotive which operated a number of Midas Muffler stores starting in 1979.  (Trial Transcript ("Tr.") at 33, 35.)  In or around 1984, Goetz and Volpe formed a real estate company – R&L Leasing – and through that company acquired the commercial real estate underlying the Midas Muffler stores.  (Id. at 33.)  In 1995, R&L Leasing became an LLC; prior to that time it had operated as a partnership.  (Id. at 40; Plaintiff's Trial Exhibit ("Pl. Ex.") 1.)  Volpe went on permanent disability and withdrew from all business activities as a result of a severe injury he suffered in 1996 and remained inactive in the business until Able Automotive closed its doors in 1999, as a result of financial difficulties.  (Tr. at 33, 35-36.)  After Able Automotive folded, Goetz and Volpe ceased to own and operate Midas Muffler stores, and the commercial real estate held by R&L Leasing became their sole business.  (Id. at 33.)  By the year 2000, R&L Leasing owned eight commercial properties.  (Id. at 33-34.)

**Changes to R&L Leasing's Ownership Structure 1997-2002**

In 1995, at the time of its conversion to an LLC, all interests in R&L leasing – capital, income and voting rights – were split 50/50 between Goetz and Volpe.  (Tr. at 40; Pl. Ex. 1.)  Effective March 31, 1997, Goetz and Volpe entered into an agreement that adjusted their relative ownership interests in light of Volpe's disability due to his injury and the fact that Goetz had become solely responsible for the management of R&L (the "1997 Agreement").  (Pl. Ex. 2.)  The 1997 Agreement provided that Goetz owned 75% of R&L and Volpe 25% and the respective parties would receive a 75/25 split in proceeds in the event of a sale or liquidation of R&L.  (Id. ¶ 1.)  Per the 1997 Agreement, income

continued to be allocated on a 50/50 split (id. ¶ 2), but Volpe retained an option to restore his equity ownership to 50% upon written notice to Goetz and upon "contributing an amount to [R&L] so that he brings the total value of his contributions to one-half of the then fair market value of [R&L]" (id. ¶ 3). Under the 1997 Agreement, until Volpe exercised his option to increase his equity ownership to 50%, Goetz held the right to vote Volpe's interests in R&L. (Id. ¶ 4.)

Effective August 31, 1999, Goetz and Volpe entered into a second agreement that again adjusted their relative ownership interests in R&L Leasing (the "1999 Agreement"). (Pl. Ex. 3.) Pursuant to the 1999 Agreement (which references and affirms the 1997 Agreement), the income split would continue to be 50/50 until December 31, 2001. (Id. ¶ 1.) In exchange, Goetz received a distribution of $176,000 from R&L. (Id. ¶ 2.) Under the 1999 Agreement, after December 31, 2001 the income split would change to 75/25 in Goetz's favor unless Volpe exercised an option to increase his equity interest on or before December 31, 2001. (Id. ¶ 1.) In order to exercise his option under the 1999 Agreement, Volpe was required to contribute $2,250,000 to his capital account, and in the event Volpe exercised his option, both the income distribution and the distribution of proceeds in the event of a sale or liquidation would return to 50/50. (Id. ¶ 3.)[2] Likewise, if Volpe did not exercise his option, the distribution of proceeds in the event of a sale or liquidation would remain at 75/25 in Goetz's favor and after December 31, 2001, the income split would adjust to 72/25 in Goetz's favor. (Id. ¶¶ 1, 3.)

---

[2]     Paragraph 3 of the 1999 Agreement contains the date December 31, 2011 as the date before which Volpe must exercise his option. This appears to be a typographical error because the date is referred to as December 31, 2001 in other parts of the 1999 Agreement. (See 1999 Agreement ¶¶ 1, 3.)

Goetz and Volpe executed an Amended LLC Operating Agreement for R&L Leasing effective January 1, 2000.  (Pl. Ex. 4.)  In connection with the execution of the Amended LLC Operating Agreement, Richard Volpe signed a letter dated September 27, 2000 confirming that the Amended LLC Operating Agreement continued to be modified by the 1997 Agreement and the 1999 Agreement and "such Agreements remain in full force and effect."  (Pl. Ex. 5.)[3]

In 2002, Volpe asked Goetz to delay the change in income distribution as of December 31, 2001 for a period of time and Goetz agreed.  (Tr. at 44.)  In May of 2002, Goetz agreed to accept a note and pledge agreement (the "Note and Pledge") from Volpe as a way of triggering Volpe's option to remain at 50/50 under the 1999 Agreement in lieu of the capital contribution contemplated by the 1999 Agreement.  (Id. at 78, 221-22.) In September of 2002, Volpe told Goetz that he thought the Note and Pledge was too onerous and asked if they could walk away from it.  (Id. at 78-79.)  Goetz agreed, but informed Volpe that, without the Note and Pledge, they would live by the provisions of the 1999 Agreement.  (Id.)  Goetz sent a letter to Volpe in September 2002 to that effect, with a copy to Hershman, confirming that he was invoking the 1999 Agreement and would proceed with the 75/25 income allocation.  (Id. at 80-82; Pl. Ex. 9.)  Thereafter, the income division between Goetz and Volpe changed from 50/50 to 75/25 in accordance with the 1999 Agreement, and such change was reflected in R&L Leasing's tax returns. (Tr. at 43, 82-84.)

---

[3]      Goetz testified that the September 27, 2000 letter and the Amended LLC Operating Agreement were prepared at the same time, notwithstanding the fact that the Amended Operating Agreement was dated "as of" January 1, 2000.  (Tr. at 45.)

**The October 2003 Settlement**

By September 2003, R&L Leasing's income had been distributed 75/25 in Goetz's favor for thirteen months. (Id. at 46.) Goetz testified that Volpe had, at this point, "expressed some displeasure and disagreement with the agreements" and "wanted to return to 50/50." (Id.) On October 2, 2003, Goetz and Volpe met at Peter Hershman's office to discuss Volpe's issues, with Hershman present.[4] (Id.) After an emotional meeting, lasting most of the day, Goetz and Volpe agreed that: (i) going forward, both the equity interest and the income distribution in R&L Leasing would be split 55/45 in Goetz's favor; (ii) Goetz and Volpe would have 50/50 voting rights (i.e. equal control in R&L Leasing); and (iii) Goetz would receive 45% of any recovery from Volpe's then pending insurance litigation related to his 1996 injury and subsequent disability. (Id. at 47-52.) Goetz and Volpe instructed Hershman to draft the documents necessary to effectuate their agreement. (Id. at 50.)

The process of completing the documents necessary to finalize the October 2, 2003 agreement took approximately two months. (Id. at 54-55.) Draft agreements were circulated. (Id. at 55.) By letter dated November 7, 2003, Goetz sent Hershman signed copies of the circulated documents and informed Hershman that he could distribute the final, signed agreements once he had received signed copies of the documents from Volpe.[5] (Id. at 59.)

---

[4] Prior to the meeting, Goetz did not tell Hershman exactly what would be covered at the meeting, but told him generally that the meeting would be about the income draws and Goetz and Volpe's relationship. (Tr. at 233.)

[5] The documents included one document Hershman prepared at Goetz's request, which released Goetz from liability for prior 75/25 income distributions. (Tr. at 55-56.)

At the end of November 2003, Goetz learned from Volpe that the insurance litigation had settled for $700,000 – a figure lower than Goetz's expectations.  (Id. at 63-64.)  By cover letter addressed to Goetz and Volpe dated December 11, 2003, Hershman released the following:  (i) an agreement executed by both Goetz and Volpe dated as of December 31, 2002, that reflected the new income allocation, capital allocation and voting rights of R&L Leasing as agreed to at the October 2, 2003 meeting; (ii) a letter executed by Volpe confirming that Goetz is entitled to 45% of net proceeds from Volpe's insurance litigation; and (iii) a letter executed by both Goetz and Volpe jointly releasing each other from any potential claims resulting from past 75/25 income distributions (collectively the "2003 Agreement").  (Pl. Ex. 6; Tr. at 66-67.)

**The Volpe Litigation**

Unbeknownst to Goetz, sometime before the end of 2003, Volpe had discharged Hershman as his attorney and retained new counsel.  (Tr. 68-69.)  In January 2004, Goetz received a letter from Volpe's new counsel, and by mid-January, Goetz came to understand that Volpe was disavowing the 2003 Agreement, as well as the 1999 Agreement and the 1997 Agreement, and claiming that he owned 50% of R&L Leasing. (Id. at 69-71.)

Starting in early 2004, after attempts to resolve their issues failed, Goetz brought a lawsuit against Volpe, and the two entered into a "very lengthy and expensive court battle" where Goetz sought to enforce the 2003 Agreement (reflecting a 55/45 split of income and distribution of proceeds upon a sale of R&L Leasing) and sought to collect

his share of the insurance litigation proceeds.[6]  (Id. at 98-100.)  The Goetz v. Volpe

lawsuit settled in April of 2006.  (Id. at 101.)  Under the terms of the settlement the

executed documents distributed by Hershman on December 11, 2003 were not enforced.

Instead, Goetz received 53% and Volpe received 47% of R&L Leasing and Goetz did not

receive any portion of the insurance litigation proceeds.  (Id.)

**Peter Hershman's Role**

As of late 2003, Goetz had known Peter Hershman for over 20 years, and since

the early 1980s Hershman had served as an attorney for Goetz personally and for R&L

Leasing.  (Id. at 36-37.)  Hershman had drafted each of the 1997 Agreement, the 1999

Agreement and the 2003 Agreement, as well as other legal documents for Goetz, Volpe

and R&L Leasing.  (See id. at 38, 43, 45, 60, 72.)

Goetz testified that in 2003 Hershman never discussed with him the possible

implications of an attorney representing two parties who have an actual or potential

conflict, nor did Hershman ever suggest that Goetz consult another attorney.  (Id. at

91-92.)  Goetz also testified that he did not know, and Hershman never told him, in 2003

that Volpe owed Hershman's law firm "a lot of money" in connection with Volpe's

insurance litigation (id. at 93) or that Peter Hershman had executed and delivered to

Volpe a sworn affidavit dated November 17, 2003 (the "Hershman Affidavit") which

read, in its entirety:

> PETER D. HERSHMAN, being duly sworn, deposes and says that:
>
> 1.     He represents Richard Volpe, an individual presently residing in
>        New York, R&L Leasing Company L.L.C. of New York, and
>        Lawrence Goetz, an individual presently residing in Florida.

---

[6]     During settlement negotiations in early 2004 and throughout the pendency of the Goetz v. Volpe
litigation, the income of R&L Leasing was split 50/50 between Goetz and Volpe.  (Tr. at 99.)

2.  In 1999, Richard Volpe and Lawrence Goetz discussed modifications and changes to their operating agreement with him which incorporated changes in the allocation of distributions.

3.  In 1999, documentation regarding a possible change in the economic relationship between the parties, and a note between the parties related thereto was prepared by him.

4.  To the best of his knowledge and based upon statements made to him by Lawrence Goetz and Richard Volpe, no such transaction in 1999 was consummated.

(Pl. Ex. 25.)  It is noteworthy that the Hershman Affidavit had been prepared and executed before Hershman released the signed copies of the 2003 Agreement on December 11, 2003.  Goetz testified that the first two paragraphs of the Hershman Affidavit are true statements.  (Tr. at 74-75.)  Goetz testified that the fourth paragraph is "a lie" because the 1999 Agreement was consummated.  (Id. at 80.)  Goetz further testified that Hershman knew the 1999 Agreement was consummated because Goetz sent a letter to Volpe in September 2002, with a copy to Hershman, stating that he was invoking the 1999 Agreement and would proceed with the 75/25 income allocation as contemplated by the 1999 Agreement.  (Id. at 80-82; Pl. Ex. 9.)

Goetz testified that he had no knowledge of the Hershman Affidavit in November or December 2003, and only became aware of its existence in early 2004 when he received a copy from Volpe's new attorney.  (Id. at 73, 87.)  In January 2004, when Goetz asked Hershman about the transaction not consummated in 1999 in paragraph 4 of the Hershman Affidavit, Hershman assured Goetz that it related to the Note and Pledge only.  (Id. at 88.)  Later, in the Goetz v. Volpe litigation, Hershman testified that the Hershman Affidavit related to both the 1999 Agreement and the 2002 Note and Pledge related thereto.  (Id. at 89.)  Also during the Goetz v. Volpe litigation, Goetz learned that

9

Volpe had informed Hershman that, as a prerequisite to finalizing the 2003 Agreement and related documents, he wanted to examine the books of R&L Leasing – a prerequisite of which Hershman did not advise Goetz in 2003.  (Id. at 90.)

## Causation

Goetz testified that the deficiencies in Hershman's legal work were the "key factor" in his decision to settle the Goetz v. Volpe litigation.  (Id. at 101.)  First, Goetz testified that because Volpe alleged in the Goetz v. Volpe litigation that he had instructed Hershman not to release the 2003 Agreement without his consent and that he had never given that consent, the enforceability of the 2003 Agreement was subject to attack.  (Id. at 102.)  Specifically, because Hershman did not obtain documentation of Volpe's consent to Hershman's release of the executed documents in December 2003, Volpe was able to argue in the Goetz v. Volpe litigation that Hershman released the executed copy of the 2003 Agreement improperly and accordingly the 2003 Agreement never became effective.  (Id. at 102, 105.)  Second, Goetz testified that the Hershman Affidavit (and Hershman's testimony in the Goetz v. Volpe litigation that the Hershman Affidavit covered the 1999 Agreement) was false and also called into question the enforceability of the 1999 Agreement, which in turn provided Volpe with an incentive to disavow the 2003 Agreement.  (Id. at 102-04.)  Goetz testified that these actions by Hershman in late 2003 and thereafter caused Goetz to conclude that the validity of both the 2003 Agreement and the 1999 Agreement were subject to attack by Volpe, which caused Goetz to settle the Goetz v. Volpe litigation for less than he believed he was entitled to.  (Id. at 102.)[7]

---

[7]      Plaintiff also offered expert opinion testimony, based on a set of assumed facts, that the costs and fees incurred by Plaintiff in the Goetz v. Volpe litigation were proximately caused by Hershman's conduct.

**Damages**

Goetz testified about two types of damages he claimed to have suffered as a result of Hershman's malpractice and breach of fiduciary duty: (i) legal costs and fees associated with the Goetz v. Volpe litigation; and (ii) the economic loss reflecting the difference between what he received under the settlement of the Goetz v. Volpe litigation and what he would have been entitled to under the 2003 Agreement but for the deficiencies in Hershman's legal work.  (Id. at 109.)

For his damages in the form of legal costs and fees, Goetz testified that he incurred litigation damages associated with the Goetz v. Volpe litigation that were comprised of: (i) money paid to Goetz's first attorneys in the Goetz v. Volpe litigation; (ii) money paid to his second attorneys in that lawsuit;[8] (iii) the amount still owed to his second attorneys; (iv) out-of-pocket costs incurred for attending depositions and court appearances; (v) fees paid to an expert; (vi) the cost of a video transcript of a deposition in the lawsuit; and (vii) duplicating costs for several thousand pages of documents.  (Id. at 131.)  Goetz's calculation of his legal costs and fees was supported by bills, receipts and other documents.  (See id. at 132-58.)

Goetz testified that his economic damages were comprised of: (i) the 45% share of the insurance litigation proceeds he never received; (ii) the difference in R&L Leasing income distribution between the 55% he would have received under the 2003 Agreement and what he actually received during the Goetz v. Volpe litigation; and (iii) the difference in the equity value of R&L Leasing between the 55% he would have received under the

---

(See Transcript of January 13, 2010 video deposition of William Doyle ("Doyle Tr.") at 40-42, 98, appended to Exhibit E to McNamara Decl. dated Feb. 26, 2010.)

[8]      Goetz's second attorneys in the Goetz v. Volpe litigation were the law firm of Olshan Grundman Frome Rosenzweig & Wolosky LLP, who were also counsel for Goetz in this action.

2003 Agreement and the 53% he received under the <u>Goetz v. Volpe</u> litigation settlement. (<u>Id.</u> at 110-112, 119-127.)  Goetz testified his total damages – litigation costs and fees together with economic damages – were $909,457.[9]  (<u>Id.</u> at 158.)

## II.  DISCUSSION

As a threshold matter, Defendants caption both motions as motions "for reconsideration" of the Court's denial at trial of Defendants' motions for judgment as a matter of law and for a new trial.  Plaintiff, citing the standard for a motion for reconsideration, urges the Court to deny both motions because Defendants have cited no factual matters or controlling law that the Court overlooked at trial and therefore Defendants are merely seeking a "second bite at the apple."  (<u>See</u> Pl. Rule 50 Mem. at 4-5; Pl. Rule 59 Mem. at 2-3.)[10]  While Plaintiff correctly cites the appropriate standard for a motion for reconsideration, despite their captions, the instant motions are more properly viewed as a full written briefing of the same motions made orally at trial and will be addressed on the merits.

---

[9]      Goetz also advanced an alternative theory of damages based on the argument that he was entitled to 75% of the income and equity of R&L Leasing based on the 1999 Agreement and calculated that measure of damages as $2,839,504.41.  (<u>See</u> Tr. at 129-130, 158.)  Because the jury's award was less than the lower of Goetz's two theories of damages, it appears the jury rejected Goetz's higher theory of damages.

[10]      Defendants' memorandum of law in support of their motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b) and defendants' memorandum of law in support of their motion for a new trial pursuant to Fed. R. Civ. P. 59 are referred to herein as "Def. Rule 50 Mem." and "Def. Rule 59 Mem." respectively.  Plaintiff's memorandum of law in opposition to Defendants' motion for judgment as a matter of law and plaintiff's memorandum of law in opposition to Defendants' motion for a new trial are referred to herein as "Pl. Rule 50 Mem." and "Pl. Rule 59 Mem." respectively.

A.      Defendants' Rule 50(b) Motion for Judgment as a Matter of Law

      In considering a motion for judgment as a matter of law, the Court must consider the evidence "in the light most favorable to the non-moving party" and draw "all reasonable inferences from the evidence that the jury might have drawn in that party's favor." Chartschlaa v. Nationwide Mut. Ins. Co., 538 F.3d 116, 122 (2d Cir. 2008) (per curiam) (quoting Diesel v. Town of Lewisboro, 232 F.3d 92, 103 (2d Cir. 2000)). A motion for judgment as a matter of law under Rule 50 will only be granted where there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such overwhelming amount of evidence in favor of the movant that reasonable and fair minded jurors could not arrive at a verdict against [the moving party]." Nimely v. City of New York, 414 F.3d 381, 390 (2d Cir. 2005) (quoting LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995)).

      1.      Causation

      Defendants argue that Plaintiff failed to put forth sufficient evidence to prove that Plaintiff's claimed damages were caused by any malpractice on the part of Hershman. Both parties agree that causation is an essential element of both Plaintiff's malpractice claim and breach of fiduciary duty claim under Connecticut law[11] and that in order for Plaintiff to prove causation, he must prove that Hershman's malpractice was a "but for" cause and a proximate cause of Plaintiff's damages.

---

[11]      The Honorable Kenneth Karas, who presided over this action before it was transferred to the undersigned, previously ruled that Connecticut law governed Plaintiff's malpractice claims in this action. (See Order dated July 6, 2009 granting in part and denying in part Defendants' motion for summary judgment (Docket Entry 55) at 1 n.2.)

Defendants first assert that in order to show "but for" causation, Plaintiff was required to prove that the 2003 Agreement was actually unenforceable and that Plaintiff failed to so prove. (Def. Rule 50 Mem. at 6.) Defendants' argument overstates Plaintiff's burden. A contract need not be held unenforceable by a court of law in order for a party to sustain damages that were in fact and proximately caused by an attorney's malpractice related to the contract. For example, a contract that is technically enforceable could be so riddled with errors resulting from an attorney's malpractice that a plaintiff could sustain significant financial damages in the form of litigation costs and fees enforcing a contract against a recalcitrant party where, absent the drafting attorney's malpractice, the party could have enforced the contract at little or no cost.[12] The law does not require a client to litigate a matter to the bitter end in order to maintain a malpractice cause of action against an attorney that damaged the client in connection with the dispute. Specifically, under Connecticut law, so long as an attorney's conduct has damaged a client, the attorney is not insulated from liability merely because the client elected to mitigate his damages by settling the litigation. Grayson v. Wofsey, Rosen, Kweskin & Keriansky, 646 A.2d 195, 200 (Conn. 1994). In sum, contrary to Defendants' argument, Plaintiff need not fulfill his burden to prove causation in any particular fashion. So long as Plaintiff provided sufficient evidence from which a rational jury could conclude that his damages were in fact caused and proximately caused by Hershman's malpractice or breach of fiduciary duty, Plaintiff need not have proved that the 2003 Agreement would

---

[12] Plaintiff's expert William Doyle testified to this effect, noting that, in his opinion, if the 2003 Agreement had been documented properly, any subsequent litigation by Volpe "had a good likelihood of being thrown out of court" on summary judgment. (Doyle Tr. at 41.)

have been found unenforceable had the Goetz v. Volpe litigation proceeded to final judgment.[13]

Defendants also argue that there was no proof "that the alleged malpractice had any connection to the decision to settle" and that Goetz's decision to settle the Goetz v. Volpe litigation "cannot be attributed to any action or failure to act by Mr. Hershman." (Def. Rule 50 Mem. at 6, 8.)  To the contrary, Goetz testified clearly and unequivocally that Hershman's improper legal work was the "key factor" in his decision to settle.  (Tr. at 101-02; see also id at 329-30.)  Further, one of Plaintiff's experts, William Doyle, opined (based on a set of assumed facts) that costs and fees incurred by Plaintiff in the Goetz v. Volpe litigation were proximately caused by Hershman's conduct as an attorney. (Doyle Tr. at 40-42, 98.)  If the jury found the assumed facts to be true based on the evidence presented, they were entitled to credit the expert opinion testimony of Mr. Doyle.  In sum, Plaintiff put forth sufficient evidence for a rational jury to conclude that, absent Hershman's improper conduct as a lawyer, the underlying Goetz v. Volpe litigation would not have occurred and that the damages sustained by Goetz in settling the case for less than he was entitled to under the 2003 Agreement were in fact caused and proximately caused by: (i) Hershman exposing the 2003 Agreement to Volpe's collateral attack when he released the signed documents without Volpe's written consent; and (ii)

---

[13]    While Defendants are technically correct that there was no evidence that any court has conclusively ruled that the 2003 Agreement was unenforceable, Defendants' protestations that the 2003 Agreement was fully enforceable are belied by the record.  There was ample testimony that Goetz was unable to enforce the 2003 Agreement in view of Hershman's failure to document that the 2003 Agreement was distributed with Volpe's approval and that due to Hershman's provision to Volpe of the false Hershman Affidavit without notice to or consultation with Goetz, Goetz was unable to enforce the 1999 Agreement without significant litigation, which would not have been necessary absent Hershman's malpractice and breach of fiduciary duty.  (See Tr. at 102; Doyle Tr. at 40-42, 98.)

Hershman providing Volpe with a false affidavit that undermined Goetz's position in the litigation.  (Tr. at 102.)

Defense counsel's argument that Goetz did not choose to settle the Goetz v. Volpe litigation because of any wrongful conduct on the part of Hershman, but rather because of the counterclaims asserted against Goetz by Volpe (Def. Rule 50 Mem. at 8) is a factual argument that defense counsel could have – and did – present to the jury through the cross-examination of Mr. Goetz as well as at summation.  (See, e.g., Tr. at 376-84, 802-05, 808-09.)  The jury apparently credited the direct testimony of Mr. Goetz over the alternative arguments as to causation that were advanced by defense counsel, as it was entitled to do.  The presence of other theories of causation that run contrary to Plaintiff's theory of the case has no bearing on the sufficiency of Plaintiff's evidence, which is the relevant issue in Defendants' Rule 50 motion for judgment as a matter of law.  Likewise, defense counsel's characterization of Mr. Doyle's expert opinion on causation as "vague" and defense counsel's attacks on the substance of his testimony (see Def. Rule 50 Mem. at 10-11) are also arguments as to the credibility of a witness and the weight that should be given to certain testimony – issues that were properly before the jury.  The Court will not intrude on the role of the jury to assess the credibility of witnesses and weigh the evidence in a post-trial motion for judgment as a matter of law.  See Nimely, 414 F.3d at 390.

      2.    Judicial Estoppel

Defendants also argue that Goetz should be estopped from contending that the 2003 Agreement was unenforceable because at the start of the Goetz v. Volpe litigation and well into that litigation, Goetz took the position that the 2003 Agreement was valid

and sought to enforce the 2003 Agreement against Volpe.  Defendants, citing a number of cases primarily from New York State courts, note that the doctrine of judicial estoppel bars litigants for playing "fast and loose" with the courts by adopting inconsistent positions in different legal proceedings.  (Def. Rule 50 Mem. at 11-13.)  For example, the doctrine of judicial estoppel, which is similar to the doctrine of unclean hands, prevents a litigant from disclaiming any interest in certain property in one proceeding when it suits his purposes and later attempting to assert an interest in the same property in a separate proceeding.  See, e.g., Festinger v. Edrich, 820 N.Y.S.2d 302 (N.Y. App. Div. 2006); Perkins v. Perkins, 641 N.Y.S.2d 396 (N.Y. App. Div. 1996).

The doctrine of judicial estoppel is not applicable to the record in this matter. First, there is nothing inconsistent in Goetz's positions from 2003 through the present. Specifically, there is nothing inconsistent about Goetz initially believing in 2004 and 2005 that the 2003 Agreement was valid and enforceable and attempting to enforce the 2003 Agreement and *subsequently realizing* based on evidentiary disclosures that, despite his initial belief, the 2003 Agreement might not be enforceable and adopting the position in this action that, while the 2003 Agreement should have been enforceable, its enforceability had been called into question by Hershman's conduct.  Goetz reconciled the differing position he took in the two actions in his testimony:

> Q.   Mr. Goetz, at the outset of the lawsuit against Mr. Volpe, did you have any opinion about the legal work that Mr. Hershman had rendered?
> A.   Yes.
> Q.   What was your view?
> A.   I was satisfied with Mr. Hershman's work.
> Q.   Did that remain your view throughout the case?
> A.   No.  As I came to learn about this case, the Goetz-Volpe case, I came to understand that there were many things that I didn't know and didn't understand.

Q.    Did you have an opinion by the conclusion of the case?
A.    Yes, I did.
Q.    What was that?
A.    That Mr. Hershman had issued a false affidavit, may have released the documents to Mr. Volpe without Mr. Volpe's permission and without the satisfaction of the prerequisites that Mr. Volpe had imposed, that there were major flaws in the contracts, that Mr. Volpe owed his firm a significant sum of money and had threatened his firm or told them that he was unhappy with the work that they had performed.   None of those things I knew at the beginning of that case.

(Tr. at 105-06.)  The jury was free to credit or reject Goetz's explanation for why his opinion of Hershman's legal work changed between 2003 and the instant action.  The above-quoted testimony demonstrates that Goetz's position was not "inconsistent" as Defendants argue, but rather, due to disclosures, it had changed over time.  Defense counsel could have – and did – argue to the jury that Goetz's changed opinion of Hershman's legal work showed that Goetz's testimony was self-serving and not credible.  (See, e.g., id. at 803-04, 810.)  The jury was entitled to reject Defendants' arguments and characterizations of Goetz's testimony and instead credit his explanation for his changed position.  Nothing in the record justifies a finding that Goetz's positions were "inconsistent" as a matter of law such that judicial estoppel or the doctrine of unclean hands would apply.

3.    Attorney-Client Relationship

Finally, Defendants argue that there was insufficient evidence for the jury to find that Hershman represented Goetz individually in connection with the 2003 Agreement.  Although Hershman testified that he only represented R&L Leasing, the entity, in connection with the 2003 Agreement (id. at 503-04), Goetz testified that he believed Hershman was acting as his attorney at the time (id. at 72-73; see also id. at 36-37, 90-

18

92).[14]  In addition to Geotz's testimony, which the jury was entitled to credit, the jury had ample evidence to conclude that an attorney-client relationship existed between Hershman and Goetz in his individual capacity in connection with the 2003 Agreement.[15] Specifically, the jury heard that:  (i) the 2003 Agreement allocated value between Goetz and Volpe, and only the two individuals – not R&L Leasing the entity – had an interest in the 2003 Agreement; (ii) Hershman had represented Goetz individually in the past; (iii) the Hershman Affidavit dated November 17, 2003 stated that (in addition to representing R&L Leasing and Volpe individually) Hershman represents "Lawrence Goetz, an individual presently residing in Florida" (Pl. Ex. 25); (iv) Hershman stated in prior testimony that he represented Goetz individually in connection with the disability insurance litigation letter that was part of the 2003 Agreement (Tr. at 505).

Defendants, in arguing that Hershman did not represent Goetz and Volpe individually, rely on certain statements made by Goetz to Hershman in an email dated December 31, 2003, specifically "I appreciate your ability to memorialize those agreements without participating in the negotiation process or taking one side or the other and remaining totally neutral, as Rich and I have always done our own negotiating going back many years."  (Pl. Ex. 33.)  First, the fact that Hershman did not participate in the

---

[14]    One of Defendants' experts, Professor Trowbridge, testified that a reasonable belief on the part of a client suffices to create an attorney-client relationship.  (Tr. at 743.)

[15]    Even if Defendants' position that Hershman did not represent Goetz individually in connection with the 2003 Agreement were correct, Goetz would not necessarily be barred from recovery.  It is undisputed that Hershman represented Goetz in an individual capacity over the years in other matters and, as of 2003, Hershman still owed Goetz a duty of loyalty as a client, regardless of whether Hershman was representing Goetz individually in connection with any particular transaction.  By acquiescing to Volpe's additional prerequisites to releasing the 2003 Agreement without informing Goetz and by providing to Volpe a false affidavit that was contrary to Goetz's interests, again without Goetz's knowledge or consent, a rational jury could have found that Hershman engaged in malpractice and breached his duty of loyalty even if the jury did not find that Hershman represented Goetz individually in connection with the 2003 Agreement.

October 2, 2003 negotiations and the fact that he remained "totally neutral" during the meeting does not foreclose the possibility that Hershman represented Goetz and Volpe individually in the later process of drafting the 2003 Agreement and facilitating the execution and release of the documents.  Second, the contents of Geotz's December 31, 2003 email and Defendants' argument that Hershman did not represent Goetz individually were properly before the jury for its consideration.  The jury rejected Defendants' characterization of the attorney-client relationship between Goetz and Hershman and credited Plaintiff's characterization.  Both theories were supported by sufficient evidence in the record and the evaluation and weighing of the evidence and the ultimate decision on the issue was properly left to the jury.[16]

B.    <u>Defendants' Rule 59 Motion for a New Trial</u>

On a motion for a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure, the movant bears a heavy burden.  A court may grant a new trial only when the court "determines that, in its independent judgment, the jury has reached a seriously erroneous result or its verdict is a miscarriage of justice."  <u>AMW Materials Testing, Inc. v. Town of Babylon</u>, 584 F.3d 436, 456 (2d Cir. 2009) (quoting <u>Nimely v. City of New York</u>, 414 F.3d 381, 392 (2d Cir. 2005)).  An evidentiary ruling, even if erroneous, is not grounds for a new trial unless it affects a party's "substantial rights."  Fed. R. Civ. P. 61;

---

[16]    Defendants make the additional arguments that an attorney's representation of an entity does not render the attorney personal counsel for the entity's principals and that a violation of a disciplinary rule does not create a *per se* act of malpractice.  (Def. Rule 50 Mem. at 15-16.)  These arguments miss the point entirely.  Plaintiff did not rely on a *per se* theory of an attorney-client relationship or a *per se* theory of malpractice based on a violation of a disciplinary rule, and the unavailability of such theories has no bearing on whether the evidence in this case was sufficient for a rational jury to find an attorney-client relationship between Goetz and Hershman and acts of malpractice and breach of fiduciary duty on the part of Hershman.

See Tesser v. Bd. of Educ. of New York, 370 F.3d 314, 319 (2d Cir. 2004); Malek v. Fed.

Ins. Co., 994 F.2d 49, 55 (2d Cir. 1993).  An error in an evidentiary ruling does not affect

a party's substantial rights, and is therefore harmless, if it is unlikely that it affected the

factfinder's judgment in some material way.  Tesser, 370 F.3d at 319.  It is the movant's

burden to show that an alleged evidentiary error at trial was not harmless error.  Id.

    1.    Evidentiary Rulings

Defendants recite a litany of specific complaints about objections sustained by the

Court on relevance grounds.[17]  (Def. Rule 59 Mem. at 4-10.)  The majority of

Defendants' complaints are wholly without merit, as defense counsel at trial provided no

cogent explanation as to how the testimony sought bore any relevance to an element of

Plaintiff's claims of malpractice and breach of fiduciary duty by Hershman, to a fact at

issue in this litigation or to the subject matter of (and Goetz's decision to settle) the

underlying Goetz v. Volpe litigation.[18]  Defendants also complain about certain sustained

---

[17]    Defendants also complain about additional lines of inquiry which they argue were precluded by the Court.  But a review of the transcript reveals that, contrary to Defendants' assertions, the Court did not sustain objections or preclude particular lines of questioning.  (See Tr. at 173 (The Court encouraged defense counsel to "get more to the point" and "move this case along" but did not preclude examination of Goetz as to his own business skill and experience); id. at 217-19 (The Court permitted inquiry into whether $176,000 payment to Goetz was charged to Volpe's capital account and Goetz's alleged statement to accountant asking him to "lose that money"); id. at 327 (The Court advised defense counsel to "[f]rame your question properly" but did not preclude inquiry into what portion of legal fees were expended in defending Volpe's counterclaims).)

[18]    On Cross examination of Mr. Goetz, defense counsel sought to inquire into the following subjects, to which the Court sustained relevance objections:  a prior work-related disability of Mr. Volpe before his 1996 disability (Tr. at 175, 186); the amount of time Goetz spent working for Able Automotive compared to R&L Leasing in 1997 (id. at 196-97); R&L Leasing's purchase in 2000 of a ski lodge in Vermont (id. at 209-10); Goetz's subjective justification for Volpe's Note and Pledge executed and later cancelled in 2002 (id. at 221); how Volpe represented his ownership interest in R&L during Volpe's matrimonial proceeding (id. at 230); the tax status of certain R&L transactions (id. at 231-32); modifications made to the books of R&L Leasing in 2004 (id. at 256-57); Volpe's decision to hire a new attorney in late 2003 without the knowledge of Goetz or Hershman (id. at 198-200, 267-68, 308); Goetz's decision not to sue Hershman in the underlying Goetz v. Volpe litigation (id. at 324); consulting charges billed by Goetz to R&L Leasing in 2000 (id. at 351); an IRS audit conducted in 2000 (id. at 423-24).  Defense counsel provides no cogent explanation as to how any of these subjects are relevant to the instant malpractice and breach of fiduciary duty litigation, either at trial on in their post-trial papers.  Merely repeating the vague generalizations that

objections that were not substantive objections on relevance grounds but rather sustained objections to the form of a question.[19]  The Court will address a few of Defendants' more substantive relevance arguments for which an explanation of the purported admissibility was provided by counsel and ruled on by the Court.[20]

      (a)  <u>Admission of "Background Information"</u>

Defendants first argue that the Court improperly limited defense counsel's attempt to introduce evidence showing the "background relationship custom and practice among Goetz, Volpe and Hershman" and thereby "forbade meaningful inquiry into the underlying Goetz v. Volpe case."  (Def. Rule 59 Mem. at 3.)  In their papers, Defendants maintain that the necessary background they sought to admit included:

      a)     the counterclaims in *Goetz v. Volpe*; specifically, the claims of wrong doing, conversion and breach of fiduciary duty by Mr. Goetz;

      b)     The key claim of Lawrence Goetz that he was represented individually by Mr. Hershman at the October 2, 2003 meeting;

      c)     The dealings Mr. Hershman had with Messrs. Goetz and Volpe and their various corporate entities over the years; and

      d)     All of the claims raised and counterclaims defended by Mr. Goetz
          …

---

these topics are "essential issues," "of great significance," and "extremely important" (Def. Rule 59 Mem. at 4-6) does nothing to demonstrate relevance to an issue in this litigation.

[19]    (<u>See</u> Tr. at 262-63 (sustaining objections to compound questions); 353-54 (sustaining objections to questions which combined two separate business entities into one question); 386-89 (sustaining objection to questions asking if Goetz had any complaint about Hershman's work at a particular time because of various possible meanings of "complaint"); 415 (sustaining objection to a compound question).)

[20]    Defendants also take issue with the Court stating "That's all right" (Tr. at 219) after one of Goetz's answers.  It appears from the transcript that the Court interjected in order to cut off a long answer by the witness to a yes or no question and that the Court's words might have been better transcribed as "That's all.  Right?"  In the pages of the transcript immediately preceding the line "That's all right," the Court had instructed the witness to "Just answer it yes or no" when defense counsel was asking yes or no questions and had reminded the witness to "Let him ask a question" in order to prevent long, non-responsive answers.  (<u>Id.</u> at 216, 218.)  In any event, any possible prejudice to Defendants was eliminated by the jury instruction noting that the Court had no opinion of the merits of the case and it was the jury's role to determine the credibility of the witnesses.  (<u>Id.</u> at 854-55.)  The Court's comment "That's all right" is not grounds for a new trial under Rule 59, either standing alone or considered together with the other arguments put forth by Defendants in the instant motion.

(<u>Id.</u>)  With respect to category (c), each and every "dealing" and "corporate entity" formed by Goetz and Volpe over a business relationship that lasted more than 25 years was and is not relevant to the issues in this litigation.  In order to present evidence of particular deals and transactions entered into by Goetz and Volpe prior to the time period at issue in this case, defense counsel was asked to explain the relevance of such transactions to an element of the defenses to the malpractice and breach of fiduciary duty claims or damages in this action.  At trial, defense counsel repeatedly failed to do so. (<u>See, e.g.</u>, Tr. at 208, 210-14, 232.)  Conclusory assertions bereft of explanation or analysis such as "[t]hey all tie in together" and "there is a background in this case that has to be brought out to have an understanding of it" do not constitute grounds for relevance or admissibility.  (<u>See</u> <u>id.</u> at 213-14.)

As to categories (a), (b) and (d) above, to the extent defense counsel presented a cogent explanation as to how particular pieces of "background" evidence were relevant to Volpe's counterclaim or to the issue of whether Hershman represented Goetz individually, defense counsel was allowed to present that evidence.  But once again, defense counsel repeatedly failed to tie particular pieces of background information or lines of cross-examination regarding specific examples of Goetz's alleged malfeasance prior to October 2003 to the theories of relevance articulated in categories (a), (b) and (d) above.  (<u>See, e.g.</u>, <u>id.</u> at 197-200, 211-214, 318-19.)  When defense counsel, at the sidebar, claimed that particular lines of questioning were relevant to Volpe's counterclaims and Goetz's decision to settle, the Court advised defense counsel that he could bring up the topic later, after he had connected the background information to a relevant issue (i.e. Volpe's counterclaims).  (<u>See</u> <u>id.</u> at 200, 319.)

After lengthy cross-examination of Mr. Goetz related to background issues and events that took place years before the events at issue in this litigation, the Court held a sidebar and asked defense counsel to explain the relevance.  (Id. at 211-14.)  First, defense counsel argued that it was relevant because "Goetz was very well served by Mr. Hershman," which the Court correctly noted was not a relevant issue because Plaintiff acknowledged that he was satisfied with Hershman's work up until certain dates and defense counsel was asking about events before those dates.  (Id. at 211.)  Next, counsel argued that the jury was entitled to "know what the relationship between these two gentlemen was over the years," which was also undisputed.  (Id. at 212.)  Finally, defense counsel argued that Volpe put in a number of counterclaims against Goetz in the Goetz v. Volpe litigation that related to the way Goetz ran the business and argued those counterclaims were the true reason Goetz settled the Goetz v. Volpe case.  (Id.)  This is a relevant issue, but the Court noted at the sidebar that nothing in defense counsel's examination at that point had anything to do with Volpe's counterclaims and Goetz's decision to settle.  (Id.)  While defense counsel had not tied any of the background information to Volpe's counterclaims as of the time of the lengthy sidebar discussing relevance, by the second day of Goetz's cross-examination, when defense counsel had tied prior transactions to the substance of Volpe's counterclaims, the Court permitted the line of inquiry, and defense counsel used much of his cross-examination to inquire into the merits of Volpe's counterclaims.  (See, e.g., id. at 342-58, 376-84.)  The Court did not err in striking defense counsel's earlier examination as to background information and prior R&L transactions on relevance grounds and Defendants were not prejudiced by the

Court's ruling because extensive cross-examination on the substance of Volpe's counterclaims was permitted.

Defendants argue that Goetz falsely signed and notarized Volpe's name on one or more R&L documents, that this was one of the subject of a counterclaim asserted by Volpe in <u>Goetz v. Volpe</u>, and that this fact, as opposed to any conduct on Hershman's part, was the true reason Goetz decided to settle the underlying <u>Goetz v. Volpe</u> litigation. Contrary to Defendants' assertions in their motions, the Court permitted defense counsel to inquire into the false notarization issue on cross-examination of Goetz.  When defense counsel first sought to undertake this line of questioning, after Plaintiff's objection, defense counsel explained the relevance and admissibility of the subject at the side bar. (<u>Id.</u> at 318.)  The Court then stated:  "You have to have a basis for it before you get it in." and "You can bring it up at a later time."  (<u>Id.</u> at 319.)  After defense counsel had moved to the issue of Volpe's counterclaims, the Court permitted inquiry into the alleged false notarization and stated to defense counsel (at sidebar):  "I will let you show [the notarization] to him and ask him whether he authorized it and what he did in connection with it and let his explanation stand, and you are bound by that explanation."  (<u>Id.</u> at 341.) After Goetz explained the documents and admitted signing Volpe's name to the document and its improper notarization by an employee, the Court sustained Plaintiff's counsel's objection to the admission of the documents, citing the Court's ruling a few moments before.  (<u>Id.</u> at 342-45.)  There was no error in these rulings.  Goetz conceded that he signed Volpe's name on the documents in question and that those signatures were subsequently improperly notarized.  Admitting the documents would have been superfluous and irrelevant.

Defendants argue that Goetz, when asked about the substance of Volpe's counterclaims, should not have been permitted to explain whether or not the counterclaims affected his decision to settle the case.  (Def. Rule 59 Mem. at 8.)  Given that the sole relevance of the allegations of malfeasance made by Volpe against Goetz was whether the counterclaims affected Goetz's decision to settle (and thereby cast doubt on Goetz's testimony on causation or damages), it was only appropriate to permit Goetz to testify as to whether the substance of Volpe's counterclaims affected the decision to settle instead of permitting defense counsel to focus solely on alleged prior wrongdoing by Goetz which – aside from the counterclaims asserted by Volpe – have no independent relevance to this litigation.[21]

Defendants argue that the Court erred in sustaining objections to defense counsel's questioning Goetz as to whether a court ever found the 2003 Agreement unenforceable.  For the reasons discussed at length in connection with Defendants' Rule 50 motion for judgment as a matter of law, *supra* part II.A.1, the Goetz v. Volpe case was settled and it was not necessary to Plaintiff's claims in this action for the 2003 Agreement to be found unenforceable by a court.  To the contrary, Plaintiff never argued that his claimed damages were caused by a court finding the 2003 Agreement unenforceable and Plaintiff concedes that no court ever did so.  The line of questioning was therefore not relevant to any fact at issue or any element of Plaintiff's claim, and the Court's rulings were correct.

---

[21]   At the beginning of the second day of Goetz's cross examination, the Court reminded counsel of the ground rules that were previously agreed to at the sidebar:  "I am going to ask that because that was the grounds upon which we agreed at sidebar that he is to be given an opportunity to explain why he felt it was important to the case or not important to his settlement of the case with Volpe."  (Tr. at 377.)

Defendants' argument that counsel's inquiry into unpaid fees owed by Goetz to his trial counsel was improperly curtailed is without merit.  First, defense counsel brought up the question of fees owed by Goetz in the context of cross-examining Goetz on his claim that Hershman was conflicted in the fall of 2003 because of the amount of monies owed by Volpe to Hershman's firm for the insurance injury and disability litigation.  (Tr. at 430.)  As the Court explained at trial, the questioning by defense counsel was improper as there was no claim of a conflict of interest with respect to Goetz's trial counsel.  (Id. at 431-32.)  Second, Defendants' claim that Goetz's unpaid attorneys' fees are Goetz's "real motive" in this action (Def. Rule 59 Mem. at 9) and Defendants' suggestion that Plaintiff's attorneys are pursuing the action to obtain payment of such fees is irrelevant to any element of Plaintiff's malpractice claim or Defendants' defenses.  Defense counsel's insinuation that there is something wrong with pursuing an action in order to recoup attorneys' fees finds no support in the record or the law.

(b)  The Wolmer Letters

Defendants and Plaintiff moved *in limine* to admit and preclude, respectively, two letters from Brent Wolmer, a Florida attorney for Goetz, to Ronald Minkoff, counsel for Volpe, on January 6 and 7, 2004.  (Exs. Q, R to McNamara Decl. dated Feb 26, 2010 (together the "Wolmer Letters").)  In the Wolmer Letters, Mr. Wolmer outlines Goetz's position with respect to Volpe's disavowal of the 2003 Agreement.  In the January 6 letter, Goetz (through Wolmer) claims that he is confident in Hershman's work, all business decisions were made by Goetz and Volpe, Hershman is not conflicted, and in his representation of R&L Leasing Hershman remained objective and free of favoritism

27

between Goetz and Volpe.[22]  At the pre-trial conference, after hearing counsel's

arguments, the Court asked how the Wolmer Letters were inconsistent with Goetz's

anticipated trial testimony.  (Transcript of Pre-Trial Conference held January 11, 2010

("PTC Tr.") at 47.)[23]  Plaintiff's counsel stated his belief that there would be nothing

inconsistent between the Wolmer Letters and Goetz's trial testimony and defense counsel

stated his belief that there would be some inconsistency, and all parties agreed to hold the

Wolmer Letters in abeyance and that they would only be admitted if Goetz's trial

testimony was inconsistent with the contents of the Wolmer Letters.  (Id. at 50-51.)

　　　　For the reasons already discussed in connection with Defendants' judicial

estoppel argument, *supra* part II.A.2, there is nothing inconsistent between Goetz's trial

testimony and Goetz's belief *in January 2004* that Hershman's legal work was proper,

that he was not conflicted and that the 2003 Agreement was fully enforceable.  As Goetz

explained, he only came to realize that there was a problem with Hershman's

representation when new facts came to light between January 2004 and the time Goetz

settled the Goetz v. Volpe lawsuit in 2006  (Tr. 105-06.)  Specifically, Goetz became

aware of alleged prerequisites to the release of the 2003 Agreement that Volpe claimed

were imposed and allegedly not fulfilled by Hershman before the documents' release and

---

[22]　　The most relevant paragraph of the January 6 Wolmer Letter reads, in its entirety:
We are extremely confident that Peter Hershman, who acted as R&L's counsel for many years, will confirm that any and all business decisions were made jointly by Goetz and Volpe.  In this regard, your assertion that Hershman is no longer able to represent the entity because of a conflict of interest is also unfounded.  In all the years that Hershman represented R&L, he did so, in our opinion, with objectivity and without favoritism to either Goetz or Volpe.  Hershman will certainly verify that at all times Goetz and Volpe made their own business decisions and that Hershman provided advice to the entity and not to them individually.  He did not act as a lawyer to either Goetz or Volpe but only acted in his capacity as corporate counsel.
(McNamara Decl. Ex. Q at 5.)

[23]　　The pre-trial conference transcript is attached as Exhibit A to the McNamara Declaration dated February 26, 2010.

Goetz became aware that Hershman testified under oath that the Hershman Affidavit related to the 1999 Agreement in direct contradiction to Hershman's assurances to Goetz in January 2004 that it only related to the Note and Pledge agreement. Therefore, Defendants have pointed to nothing inconsistent between Goetz's trial testimony and the Wolmer Letters. The Wolmer Letters do not constitute admissions against interest and in accordance with the parties' agreement reached at the pre-trial conference, the Wolmer Letters were only to be admitted if they contradicted Goetz's trial testimony.[24] Under these circumstances, the Court did not err in declining to admit the Wolmer Letters.[25]

2.     Scope of Expert Testimony

Defendants next challenge the Court's rulings with respect to both Plaintiff's and Defendants' expert witnesses. The bulk of Defendants' complaints arise from a

---

[24]     There is one line of the January 6, 2004 Wolmer Letter that, standing alone, appears inconsistent with Goetz's trial testimony that he was represented individually by Hershman: "[Hershman] did not act as a lawyer to either Goetz or Volpe but only acted in his capacity as corporate counsel." (McNamara Decl. Ex. Q at 5.) First, it is unclear from the face of the passage whether the statement refers to Hershman's representation generally or refers to the "business decisions" reached by Goetz and Volpe individually referenced in the prior sentence. In the context of business negotiations and business decisions, there is no dispute that Hershman represented neither individual and remained neutral. It was only in Hershman's distribution of the executed 2003 Agreement and related representation and in his execution of the Hershman Affidavit that Goetz alleged malpractice and breach of fiduciary duty. Second, and more important, at the pre-trial conference the parties agreed to hold the Wolmer Letters in abeyance and that they would only be admissible if Goetz's trial testimony was inconsistent with their contents. (PTC Tr. at 50-51.) While the question of whether the above-quoted sentence would be inconsistent with Goetz's trial testimony was raised at the pre-trial conference (id.), each time the Wolmer Letters were discussed at a sidebar during trial, defense counsel did not point to any inconsistency nor did he direct the Court's attention to the above-quoted sentence (see Tr. at 304-05, 443-44). Rather, defense counsel argued for their admission on other grounds, not in accordance with the agreement reached at the pre-trial conference, and the Court did not err in declining to admit the Wolmer Letters.

[25]     Defendants also argue that the Court erred in admitting Volpe's original answer in the Goetz v. Volpe matter and should have instead admitted the amended answer because it superseded the original answer as a matter of law. (Def. Rule 59 Mem. at 22; Tr. at 442-43.) The original answer was admitted only to refute the suggestion made on cross-examination that Mr. Volpe *never* made a particular claim – the original answer showed that, in fact, Volpe at one time *did* make that claim. (Tr. at 442-43.) The fact that the amended answer superseded the original answer in Goetz v. Volpe has no bearing on its admissibility in this action as relevant to one specific argument raised on cross-examination. Defense counsel's attempt to admit the amended answer on re-cross and examine Goetz on all the counterclaims raised therein went far outside the scope of redirect and the limited issue to which the original answer was relevant and the Court did not err in precluding this examination on re-cross. (Id. at 448-51.)

29

fundamental misunderstanding of the proper role of expert witnesses.  Experts testify to their opinions.  Experts are not fact witnesses and they are not competent to testify as to the underlying facts upon which the experts' opinions are based.  Experts also do not opine on the credibility of witnesses.

(a)  Defendants' Experts

The line between fact witness and expert witness was frequently blurred or crossed in defense counsel's direct examination of Defendants' experts.  Thomas Daniells was asked to review certain materials, including documents, pleadings and deposition transcripts, and was not asked to assume a set of facts.  (Tr. at 681.)  Defense counsel then asked him to opine on issues such as who Hershman represented in 2003 and whether Hershman departed from good and accepted practice.  (Id. at 682-83.)  Plaintiff's sustained objections to these questions were entirely appropriate as the "opinion" testimony sought was not opinion testimony at all and required the witness to make factual conclusions after evaluating the competing testimony of different witnesses – a process Mr. Daniells could not undertake by reviewing documents and transcripts and is outside the proper scope of any expert's opinion testimony.

Contrary to Defendants' assertions, the questioning of Mr. Daniells was not curtailed based on his reliance on certain documents not in evidence (see Def. Rule 59 Mem. at 11), but rather because the testimony sought was factual in nature, not expert opinion.  Further, while Defendants are correct that Federal Rule of Evidence 703 permits experts to rely on facts or data not admissible in evidence, relying on transcripts of prior testimony to opine on a contested factual issue is not permitted by Rule 703 because the expert is not relying on *facts* or *data*, but rather would be making credibility assessments

as to conflicting testimony, which is a function reserved solely for the jury.  See Nimely
v. City of New York, 414 F.3d 381, 397-98 (2d Cir. 2005).

     (b)  Plaintiff's Experts

     Defendants' challenge to Plaintiff's experts' testimony is based on the
misapprehension that there is something inherently wrong about an expert testifying to
his or her opinion based on a set of assumed facts, as Plaintiff's experts did at trial.  (Def.
Rule 59 Mem. at 12-18.)  See Cunningham v. Gans, 507 F.2d 496, 500-01 (2d Cir. 1974)
(holding expert examination based on assumed facts and hypothetical questions
permissible).  As the Court advised counsel repeatedly at trial, expert witnesses are not
fact witnesses (see Tr. at 620, 630, 639, 654-55), and defense counsel's attempts to quiz
Plaintiff's experts on their personal knowledge of the facts of this case were improper.[26]
See Highland Capital Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 180 (S.D.N.Y.
2008).  Contrary to Defendants' assertion, an expert witness's lack of personal
knowledge as to the facts of the case in no way renders his or her opinion testimony
"untrustworthy as a matter of law."  (Def. Rule 59 Mem. at 13.)  Expert witnesses are not
expected to have personal knowledge of the facts of the case.  To the extent defense
counsel wished to challenge the sufficiency of the documents on which the experts based
their opinions or cross-examine the experts by asking if their opinion would change if a
new fact were assumed, he was free to do so.  But defense counsel's cross-examinations
were not of this nature; rather the questions either tested the experts' personal knowledge

---

[26]     A few examples of defense counsel attempting to test the Plaintiff's experts' personal knowledge of the facts are:  "Do you know if Richard Volpe had ever been deposed?"; "Do you know if there had been any correspondence between Mr. Goetz and Mr. Volpe during the year 2003, just the two of them?"; "Do you know, of your own accord, what those serious disagreements were?" (Doyle Tr. at 63-64); "Do you know what if any effect that affidavit had on the end result of that case?" (Tr. at 620); "What is the advice that Mr. Goetz consulted with Mr. Hershman about, what did he ask?" (Id. at 647.)  For more examples, see also Doyle Tr. at 66, 74-75, 108-09; Tr. at 630, 639, 641, 649, 652-53, 668, 670-71.

of the facts or asked the expert to dispute the accuracy of the assumed facts.  To the

extent defense counsel wished to attack the factual accuracy of the assumed facts

underlying Plaintiff's experts' opinions, he was free to assemble evidence to do so and

present it to the jury.  It is not proper cross-examination of the experts, however, because

the experts cannot testify as to the accuracy of the facts they have been asked to assume.

      The Court was careful to instruct the jury more than once that the assumed facts

relied on by the experts were not evidence and that it was up to the jury to decide whether

the assumed facts were true, based on the evidence and testimony.  (Tr. at 792-94, 853.)

      3.   <u>Damages</u>

      Defendants make two arguments with respect to damages.  First, in connection

with reaching a value for Goetz's lost two percent interest in R&L Leasing's real estate,

Defendants contest the support for Goetz's calculation of the value of the Midas property

(one of R&L Leasing's real estate holdings), arguing that there was "no proof whatsoever

that these Midas properties were actually worth $4 million."  (Def. Rule 59 Mem. at 24.)

Defendants' argument is misplaced.  At trial, defense counsel objected to Plaintiff's use

of a particular document (a transfer tax form) to show the valuation of the Midas

property.  (Tr. 114-17.)  But the transfer tax form was not the sole evidence on which the

$4 million valuation was based.  Goetz testified that the valuation was agreed to by Volpe

and himself when R&L was split up after the 2006 settlement and was based on an

outside offer that R&L had received for the property.  (<u>Id.</u> at 113.)  After hearing defense

counsel's objection, the Court agreed and stated to the jury "I am not allowing [the

transfer tax form] insofar as it supports the valuation of the properties" and instructed the

jury that the testimony about the valuation as being reached by Volpe and Goetz, and any

documentary corroboration thereof, is the evidence the jury would have to base its

decision on.  (Id. at 118.)  To the extent defense counsel believed the $4 million valuation

for the Midas property was inaccurate or based on incorrect assumptions, he was free to –

and did – cross-examine Goetz on that subject (see id. at 432) as well as present other

evidence.  In short, the accuracy of Goetz's valuation of the Midas property is a factual

issue that was properly put before the jury and is not grounds for a new trial.

Defendants also argue they are entitled to a new trial because the jury verdict

form did not break out different categories of damages.  Without citing any authority in

support of their position, Defendants argue that they were prejudiced in this regard

because the Court should not have "permit[ted] the jury to consider legal fees and

expenses in the first place."  (Def. Rule 59 Mem. at 23.)  Defendants appear to base this

reasoning on the fact that they moved *in limine* to exclude all evidence of damages

incurred in the form of legal fees and costs, which the Court did not explicitly rule on and

proceeded to allow the jury to consider such evidence.  Moving *in limine* to exclude a

category of damages because counsel asserts that there will be no evidence from which a

jury could find causation as to that category of damages is, of course, an improper use of

a motion *in limine* and any such motion is premature.[27]  Also, contrary to Defendants'

assertion, their application to modify the verdict form to break out specific categories of

damages was not made at the charging conference, but was made after the charge was

read to the jury, after the verdict form was distributed to and reviewed with the jury (Tr.

---

[27]     In fact, one of the cases Defendants cite in their brief on this issue stands for the proposition that a
motion *in limine* may not "be used to argue, as [defendant] does here, than an item of damages may not be
recovered because no reasonable person could find that it was proximately caused by the defendant's acts.
That is the function of a motion for summary judgment, with its accompanying and crucial procedural
safeguards."  C & E Servs., Inc. v. Ashland Inc., 539 F. Supp. 2d 316, 323 (D.D.C. 2008).  Therefore,
"[Defendants'] attempt to use a motion *in limine* to preclude claims that they argue lack evidentiary support
must fail."  Id.

881-84, 888-90) and, more importantly, after defense counsel had agreed on the record

that the verdict form was satisfactory (id. 847-48), which in turn occurred after multiple

discussions of the verdict sheet (see id. at 837-40, 844-47).  Any objection to the format

of the verdict form was waived by defense counsel and, in light of Plaintiff's counsel's

position that, for the sake of simplicity for the jury, the verdict sheet should contain only

a single damages number (id. at 890), the Court did not err in denying Defendants' last-

minute objection to the verdict form.

       4.     <u>Jury Charge</u>

      Defendants argue that the Court erred in instructing the jury that they could find

an attorney-client relationship between Goetz and Hershman if they found that Goetz

held a reasonable belief that Hershman was acting as his counsel.  (<u>Id.</u> at 869.)  At the

charging conference, Defendants objected to the requested charge claiming: (i) there was

no support in the testimony for such a charge; and (ii) such a charge would be duplicative

and prejudicial.  (<u>Id.</u> at 761.)  In response, Plaintiff's counsel cited testimony by Goetz

that he believed Hershman was his attorney and cited Defendants' theory of the case that

in October 2003 Hershman was representing the entity R&L Leasing and not either

individual as support for the charge in the record.  (<u>Id.</u> 72-73, 513, 761.)  The requested

charge was not duplicative as Defendants claimed.  As Plaintiff's counsel correctly noted,

the charge (in its draft form at the time of the charging conference) "talks about an

implied relationship, but it doesn't explain how that arises, and this explains how it

arises.  It arises from basically the attorney behaving like an attorney and the client

reasonably believing that he is indeed his attorney."  (<u>Id.</u> at 760.)  While neither Plaintiff

nor Defendants cited Connecticut law either in favor of or opposed to such a charge, one

of Defendants' own experts, Professor Trowbridge, who has sat on the Connecticut Bar

Association Committee on Professional Ethics for over 30 years and was qualified as an

expert in the areas of lawyers' ethical standards and professional obligations, testified

that an implied attorney-client relationship arises under the law where an attorney renders

legal services for someone who reasonably believes that the attorney is acting in his

interest.  (Id. at 721, 723, 734.)[28]  In light of the testimony of Defendants' own expert

supporting Plaintiff's requested charge, Defendants have failed to show they suffered

prejudice as a result of the Court's charge.


C.      Plaintiff's Motion for Prejudgment Interest

        Plaintiffs move for an award of prejudgment interest on a portion of the jury

verdict pursuant to Connecticut General Statute § 37-3a, which provides that a court may

award pre-judgment interest in civil actions at the rate of ten per cent per year as

"damages for the detention of money after it becomes payable."  Conn. Gen. Stat.

§ 37-3a.  The parties agree that the question of pre-judgment interest is governed by

Connecticut law in this case.  See Entron, Inc. v. Affiliated FM Ins. Co., 749 F.2d 127,

131 (2d Cir. 1984).  The parties also agree that an award of pre-judgment interest under

§ 37-3a is an equitable determination within the discretion of the Court, see Prime Mgmt.

Co. v. Steinegger, 904 F.2d 811, 817 (2d Cir. 1990) (quoting Nor'easter Grp., Inc. v.

---

[28]     While the Court has located no Connecticut Supreme Court cases on point, a few lower
Connecticut courts have employed the "reasonable belief" formulation when determining whether an
attorney-client relationship exists.  See Somma v. Fabian, No. CV990174508S, 2005 WL 1524937, at *3
(Conn. Super. Ct. June 3, 2005); Darlow v. Day, Berry & Howard, No. CV970575509S, 1999 WL 179631,
at *7 (Conn. Super. Ct. Mar. 4, 1999).  Defendants' reliance on United States v. Int'l Bhd. of Teamsters,
119 F.3d 210 (2d Cir. 1997), is misplaced as that case does not represent controlling Connecticut law and
arose in a different factual context – the privilege or lack of privilege of communications by an officer to
corporate counsel in connection with an internal investigation.

<u>Colossale Concrete, Inc.</u>, 542 A.2d 692, 700 (Conn. 1988)), and agree that in deciding whether to award pre-judgment interest, the Court should consider three factors:  (i) whether the detention of money was wrongful under the circumstances; (ii) whether the sum recovered was a liquidated amount; and (iii) whether the party seeking prejudgment interest diligently presented claims during the course of proceedings.  <u>Brandewiede v. Emery Worldwide</u>, 890 F. Supp. 79, 82 (D. Conn. 1994).

      1.    <u>Plaintiff's Statutory Entitlement to Prejudgment Interest</u>

      Defendants do not seriously dispute the amount of prejudgment interest claimed by Plaintiff, but rather challenge Plaintiff's entitlement to receive prejudgment interest. Defendants first argue that this action is a negligence case, and interest in negligence actions is governed by Connecticut General Statute § 37-3b, not § 37-3a relied on by Plaintiff.  This argument is unavailing because, as Plaintiff correctly notes, § 37-3b is inapplicable because it relates to "damages for injury to the person, or to real or personal property, caused by negligence," not economic damages, which are at issue here, and because § 37-3b relates solely to post-judgment interest, and here Plaintiff seeks prejudgment interest.[29]  Further, contrary to Defendants' argument, nothing in § 37-3a indicates that the section excludes negligence claims.  Rather by its plain terms, § 37-3a applies to "civil actions" and prejudgment interest may be assessed "as damages for the detention of money after it becomes payable."  Conn. Gen. Stat. § 37-3a.

---

[29]      Connecticut General Statutes § 37-3b(a) reads:
(a) For a cause of action arising on or after May 27, 1997, interest at the rate of ten per cent a year, and no more, shall be recovered and allowed in any action to recover damages for injury to the person, or to real or personal property, caused by negligence, computed from the date that is twenty days after the date of judgment or the date that is ninety days after the date of verdict, whichever is earlier, upon the amount of the judgment.

Defendants next argue that Plaintiff is not entitled to prejudgment interest because it was Volpe, not Hershman who personally wrongly detained funds from Plaintiff. The Connecticut Supreme Court spoke to this issue directly in Chapman Lumber, Inc. v. Tager, 952 A.2d 1 (Conn. 2008), where it upheld a trial court's award of prejudgment interest against an attorney who was sued for economic damages under several tort theories of liability and whose wrongful conduct caused another party to wrongfully withhold funds that were due to the plaintiff. Id. at 23-24. The Chapman Lumber case is directly on point and Defendants' attempts to distinguish it based on minor factual points are unpersuasive.

Finally, Defendants argue that there can be no prejudgment interest where the jury did not allocate the damages it awarded. (Def. Interest Mem. at 14.)[30] This argument is unpersuasive so far as it goes to Plaintiff's entitlement to prejudgment interest, but it is important in the Court's exercise of discretion when considering the proper amount of prejudgment interest.

2.      Amount of Prejudgment Interest[31]

Plaintiff concedes that he is not entitled to prejudgment interest on any of the attorneys' fees and costs claimed as part of his damages. Therefore, assuming in Defendants' favor that the jury awarded the full amount of attorneys' fees and costs,

---

[30]    Plaintiff's memorandum of law in support of motion for an award of prejudgment interest, Defendants' memorandum of law in opposition to Plaintiff's motion for an award of prejudgment interest, and Plaintiff's reply memorandum of law in further support of motion for an award of prejudgment interest are referred to herein as "Pl. Interest Mem.," "Def. Interest Mem." and "Pl. Interest Reply Mem." respectively.

[31]    While Defendants do not contest the amount of prejudgment interest sought (and only contest Plaintiff's statutory entitlement to any prejudgment interest), as a matter of equity and in exercising this Court's discretion in awarding prejudgment interest, the Court must examine Plaintiff's computation of interest.

Plaintiff asks for prejudgment interest on $414,716.59.[32]  Plaintiff argues that the amounts wrongfully withheld by Volpe include:  $315,000 in insurance litigation proceeds; $78,174 in income distributions from R&L Leasing; and $121,000 in lost ownership interest in R&L Leasing, and asserts that "[a]ll of these losses date back to January 1, 2004."  (Pl. Interest Mem. at 2.)  While the amounts cited are supported by the evidence, the Court does not agree that all of the listed losses date to January 1, 2004.  First, the income distribution component (specifically, the difference between the 55% Goetz was entitled to under the 2003 Agreement and the income distributions he actually received) was agreed to as of January 1, 2004, but the income payments became due periodically over time.  Therefore, it would be incorrect to begin accruing prejudgment interest on the income distribution total starting January 1, 2004.[33]

Second, it is unclear that January 1, 2004 is the proper time for prejudgment interest to begin accruing on the lost ownership interest in R&L.  While under the 2003 Agreement, Goetz was entitled to 55% of R&L Leasing as of January 1, 2004, during the time that 5% of the business was in dispute – between January 2004 and April 2006 – 5% of the business was not being "withheld" in the same way that a sum certain of money can be withheld.  While neither Goetz nor Volpe had exclusive ownership and control over the disputed 5%, it was still part of an ongoing business and continued appreciating

---

[32]      $414,716.59 equals the full damages award ($810,000) less the full amount claimed in litigation and settlement costs and fees ($395,283.41).  (See Pl. Interest Mem. at 5.)

[33]      In his reply brief in support of a prejudgment interest award, Plaintiff appears to recognize this point, stating that the amount wrongfully withheld from Plaintiff as of January 1, 2004 totaled $436,000, which equals the insurance litigation component ($315,000) plus the lost ownership interest component ($121,000).  (Pl. Interest Reply Mem. at 5-6.)  Plaintiff then argues that because the amount $436,000 is greater than the amount on which prejudgment interest is sought ($414,716.59) the total amount of interest sought should be calculated starting January 1, 2004.  (Id. at 6.)  This is not a fair assumption because assuming in Defendants' favor that the jury awarded the full amount of damages based on lost income distributions, the prejudgment interest on those amounts would start accruing at later dates and the total prejudgment interest award would be smaller.

(or depreciating) at a normal rate during the 28-month dispute.  Had Goetz prevailed in 2006 and received a larger percentage than he actually received, he would have received the higher percentage *as well as the appreciation value* on that higher percentage that had amassed between January 2004 and April 2006.  It therefore appears that the correct way to calculate prejudgment on the lost ownership interest in R&L Leasing, that better comports with the economic reality of the situation, would be to start the interest accrual no earlier than the April 2006 settlement, based on the actual 2% ownership interest loss to Goetz, measured at that time.

Defendants argue that Plaintiff is not entitled to prejudgment interest because he delayed in bringing his claim against Hershman for more than three years after the conduct complained of.  Again, the Court views this argument as relevant not to Plaintiff's general entitlement to prejudgment interest under Connecticut law but to the amount of prejudgment interest that should be awarded as a matter of the Court's discretion.  Plaintiff has diligently pursued his claims for the past six years, first against Volpe and later against Hershman.  But while Plaintiff cannot be viewed as anything less than diligent in this litigation, Defendants are correct that Plaintiff did not bring a claim *against Hershman* until October 2006.  It would be inequitable to hold Hershman responsible for all six years of elapsed time between the events at issue in this litigation and the January 29, 2010 judgment, when the decision to initially pursue Volpe instead of Hershman rested solely with Plaintiff.

For the foregoing reasons, particularly the large delay between the conduct complained of and the filing of this action, the uncertainty about which components of economic damages are included in the jury's verdict and the uncertainty about when

prejudgment interest should start to accrue for different components of damages, as a matter of equity and as an exercise of this Court's discretion, Plaintiff is awarded prejudgment interest for the full portion of the judgment for which he seeks prejudgment interest ($414,716.59), but the prejudgment interest will run from the filing of the Complaint in this action on October 5, 2006 and not from January 1, 2004.  There is no question that each component of non litigation-related damages was a liquidated sum as of October 5, 2006, and running the interest calculation from the filing of the Complaint eliminates the potential prejudice that would result from Defendants effectively being held responsible for more than two and a half years of prejudgment interest that accrued while Plaintiff was not pressing a claim against Defendants.  The prejudgment interest awarded equals $137,594.87.[34]

## III.  CONCLUSION

For the reasons discussed herein, Defendants' motion for a judgment as a matter of law is denied, Defendants' motion for a new trial is denied, and Plaintiff's motion for prejudgment interest is granted in part.  Plaintiff Lawrence Goetz is awarded additional damages of $137,594.87 in prejudgment interest on the jury's award of $810,000.[35]

---

[34]     The total prejudgment interest equals 10% interest per year on $414,716.59 from October 5, 2006 to January 29, 2010, the date of judgment.  Specifically, the total equals $41,471.65 per year for three years (calendar years 2007, 2008 and 2009) plus $113.62 per diem for 116 days (87 days in 2006, 29 days in 2010).

[35]     In light of this ruling on the issue of prejudgment interest, the Court notes that the parties may need to reassess the amount of the appeal bond in this action, previously posted by Defendants on March 31, 2010.

IT IS SO ORDERED.

Dated: New York, New York
      July 14, 2010

Robert P. Patterson, Jr.

U.S.D.J.

Copies of this opinion were faxed to:

**Thomas James Fleming / Jennifer Heil**
Olshan, Grundman, Frome, Rosenzweig & Wolosky, LLP
Park Avenue Tower
65 East 55th Street
New York , NY 10022
Fax: (212) 451-2222

**Vincent D. McNamara / Helen M. Benzie**
Law Office of Vincent D. McNamara
Tower Square - Suite One, 1045 Oyster Bay Road
East Norwich , NY 11732
Fax: (516) 922-9208